UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Norfolk Division**

SALYIA C.,[1]

      **Plaintiff,**

**v.**                                           **Civil Action No. 2:25-cv-571**

**FRANK BISIGNANO,
COMMISSIONER OF
SOCIAL SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff Salyia C. ("Plaintiff") seeks judicial review of the Commissioner of Social Security's denial of her claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act ("SSA"). Plaintiff argues that the Administrate Law Judge ("ALJ") inadequately explained why she rejected significant limitations allegedly from Plaintiff's impairments and thus lacked substantial evidence to support Plaintiff's residual functional capacity ("RFC") finding. This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure. For the reasons stated below, this Report recommends that the court affirm the final decision of the Commissioner.

## I.     PROCEDURAL BACKGROUND

In November 2021, Plaintiff filed for DIB and SSI, alleging disability beginning July 16, 2021, due to the following conditions: "heart attack, hyperthyroidism, anxiety, bipolar disorder, depression, shoulder injury, herniated disc and pinched nerve, arm injury, elbow problem, wrist

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

1

problem, back problem, asthma, hyperthyroid and amputated finger." (R. 225, 239, 386-89, 395-98). The state agency denied her applications initially on March 8, 2023, and upon reconsideration on April 23, 2024. (R. 224, 238, 251-52). Plaintiff requested an administrative hearing, which was held via telephone on November 7, 2024. (R. 50, 329-31). At the hearing, Plaintiff was represented by counsel and an impartial vocational expert ("VE") testified. (R. 50, 52, 69).

On January 31, 2025, the ALJ found that Plaintiff has not been disabled since the date of her alleged disability onset date and denied her claim for DIB and SSI. (R. 25-43). The ALJ determined that Plaintiff's RFC enabled her to perform light work and that there are a significant number of jobs in the national economy that could accommodate Plaintiff's limitations. (R. 32, 42-43). Thus, Plaintiff was not disabled under the meaning of the SSA and was ineligible for DIB and SSI through the date of the decision. (R. 45). On July 8, 2025, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the Commissioner's final agency decision. (R. 6-11).

On September 11, 2025, Plaintiff filed her Complaint in this court. (ECF No. 1). Plaintiff seeks judicial review of the Commissioner's final decision that she was not entitled to DIB or SSI. On January 15, 2026, Plaintiff filed a Motion for Summary Judgment, (ECF No. 12),[2] and a brief in support. Br. Supp. Mot. Summ. J. ("Pl.'s Br.") (ECF No. 13). Plaintiff contends that the ALJ did not adequately analyze Plaintiff's complex regional pain syndrome ("CRPS") diagnosis and limitations related to the diagnosis, resulting in an RFC determination by the ALJ that was not supported by substantial evidence. Id. at 4-10. The Commissioner opposed Plaintiff's brief,

---

[2] Under the Supplemental Rules for Social Security Actions, effective December 1, 2022, appeals from final decisions of the Social Security Administration are presented for decision by the parties' briefs. Supp. R. Soc. Security Actions Under 42 U.S.C. § 405(g), Rule 5. Here, Plaintiff filed her brief in support of a Motion for Summary Judgement. This Report addresses the briefs as filed. As such, this Report recommends the court DENY Plaintiff's Motion for Summary Judgment and the requested relief in Plaintiff's brief for the reasons explained below.

2

arguing that the ALJ properly considered the entire record as a whole, including Plaintiff's subjective complaints, prior administrative medical findings, medical opinions, and medical records, as is required for a CRPS diagnosis, and thus had ample evidence in the record to support the RFC finding and denial of DIB and SSI. Def.'s Br. Supp. Cmm'r's Decision Den. Benefits & Opp'n to Pl.'s Br. ("Def. Opp'n") (ECF No. 14, at 12-20). After a review of the record, this Report considers both parties' arguments.

## II.    FACTUAL BACKGROUND

Plaintiff was born on November 7, 1980, and she was 40 years old at the time of her alleged disability onset date, making her a younger individual. (R. 41, 225, 239, 253, 263); see 20 C.F.R. §§ 404.1563, 416.963. Plaintiff has limited education and is unable to perform her past relevant work as a material handler due to her RFC. (R. 41, 63-64, 69). Plaintiff has not engaged in substantial gainful activity since July 16, 2021, the alleged onset date. (R. 27).

### A.    Plaintiff's Health Treatment

Plaintiff's arguments do not require a complete review of her medical history as she disputes the ALJ's RFC determination largely for a failure to properly analyze her CRPS diagnosis, related subjective complaints of pain, and the alleged resulting need for an assistive device.[3] The records relevant to the evaluation are summarized below.[4]

---

[3] Plaintiff has been diagnosed with other physical impairments, but because those impairments were treated and do not result in any work-related limitations, they were deemed non-severe. (R. 28). The ALJ's decision notes that she still considered all of Plaintiff's medically determinable impairments, even the non-severe impairments, when assessing Plaintiff's RFC. Id. Those impairments, however, are not discussed at length in this Report since Plaintiff did not challenge the severity findings for any of them in her brief. Similarly, Plaintiff does not challenge the ALJ's analysis of her mental health impairments, so this Report does not discuss them either.

[4] Plaintiff's medical records report several signs and symptoms of physical or mental impairments, but the ALJ's opinion notes that, as per regulations, without any objective findings or clinical signs, complaints of these signs and symptoms are not medically determinable impairments and "will not be found to affect [Plaintiff's] ability to do basic work activities." (R. 28-29). As such, while this Report may briefly mention these signs and symptoms, especially since the ALJ considered them, they are not medically determinable impairments that affect Plaintiff's RFC.

In December 2020, a few months before her alleged onset date, Plaintiff complained of neck and low back pain. (R. 529-34). Upon examination in late December, Plaintiff had a full active and passive range of motion, normal palpation, and normal and equal muscle strength and tone. (R. 529). Additionally, an MRI of Plaintiff's lumbar spine in December 2020 showed no more than minimal degenerative changes. (R. 530, 875-77). In 2021, Plaintiff continued to report intermittent neck and back pain. In February 2021, her providers concluded that Plaintiff's pain and symptoms were not a result of major neurological problems but were more likely caused by an existing metabolic disorder and aggravated by a motor vehicle accident. (R. 1002, 1005, 1007-08). A February 2021 nerve conduction study of Plaintiff's bilateral lower extremities and a December 2021 nerve conduction study of her bilateral upper extremities were both normal, with no evidence of peripheral neuropathy or radiculopathy. (R. 1018, 1070).

In July 2021, Plaintiff began treatment at Orthopaedic & Spine Center due to a work-related injury that led to complaints of right upper extremity pain. (R. 937). Upon examination of her right arm, Plaintiff had decreased light touch sensation but no swelling and a normal range of motion. (R. 938). Plaintiff continued to complain of pain and sensitivity, for which she received treatment for through October 2022. (R. 925-39, 1065-93). Plaintiff's examination records varied, generally finding slightly decreased strength and tenderness to palpation in her arm but an intact range of motion. See id. From September to November 2022, Plaintiff underwent physical therapy. (R. 1891-1919).

In June 2023, Plaintiff began pain management treatment with Sun D. Kwon, M.D., that continued till September 2024. (R. 1223, 1845). During her visits, Plaintiff reported continued right upper extremity pain, and her physical examinations noted a decreased range of motion with mild swelling and limited strength. (R. 1189-227, 1845-49). Additionally, Plaintiff was first

4

diagnosed with CRPS in June 2023 during her visits with Dr. Kwon. (R. 1322-23). This diagnosis could be the result of Plaintiff's 2014 injury in which she slammed her left fifth finger in a door, (R. 1640-41), or from a 2015 left index finger amputation, (R. 1613). Plaintiff was then diagnosed again for CRPS due to evidence of lower extremity injuries that could have triggered the condition. First, in September 2022, Plaintiff visited an emergency department for moderate swelling of her left ankle and tenderness to palpation throughout her foot, ankle, and lower leg. (R. 1354). Then, Plaintiff complained of bilateral foot pain two years later to a podiatrist. (R. 1822-25). During this visit, Plaintiff was diagnosed with CRPS again. Id.

**B.    Opinion Testimony**

**1.    State Agency Medical Consultants' Opinions**

On March 8, 2023, state agency medical consultants Jacquelyn A. Harrison, Ph.D.,[5] and Howard Stein, M.D., independently reviewed Plaintiff's medical records at the initial level, finding that Plaintiff was not disabled from the alleged onset date. (R. 224-50).[6] Plaintiff had severe medically determinable impairments, including: soft tissue injury of an upper extremity; depressive, bipolar, and related disorders; all disorders of the thyroid gland (except malignant neoplasm); carpal tunnel syndrome; acute myocardial infarction; asthma; anxiety and obsessive-compulsive disorders; and disorders of the skeletal spine. (R. 230, 244). Dr. Stein evaluated Plaintiff's physical RFC and found that Plaintiff had some exertional limitations. (R. 232, 246). He opined that Plaintiff could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; Plaintiff was limited in her ability to push and/or pull in her upper extremities; Plaintiff

---

[5] Dr. Harrison evaluated Plaintiff's mental RFC and concluded that Plaintiff's "[mental health] impairments do not preclude all work," and Plaintiff "should be able to perform [simple, routine, repetitive tasks (SRRTs)] in a low stress, non production environment with no contact with the public and limited contact with coworkers and supervisors." (R. 231, 235, 245, 249). Given that Plaintiff does not challenge the ALJ's mental health impairment analysis, this Report does not discuss Dr. Harrison's opinion at greater length.

[6] Dr. Stein (and Dr. Harrison) reviewed Plaintiff's medical records for both her DIB claim, (R. 225-37), and her SSI claim, (R. 239-50). The Disability Determination Explanation reports are largely identical for both claims.

could stand, walk, and sit for about six hours in an eight-hour workday with normal breaks; Plaintiff had a frequent postural limitation for stooping; and Plaintiff was limited to frequent but not constant reaching in front and/or laterally, reaching overhead, handling, and feeling with her right upper extremity, and limited in fingering with both extremities. (R. 232-33, 246-47). Dr. Stein considered Plaintiff's physical symptoms and reported activities of daily living before determining that her impairments "do not preclude all work" and that she "should be able to perform [her] RFC within the limitations noted." (R. 233, 247).

On April 23, 2024, state agency physician Daljit S. Caberwal, M.D., and psychologist Sunny Alderini, Psy. D.,[7] reviewed Plaintiff's medical records on reconsideration and upheld the initial review conclusion that Plaintiff was not disabled from the alleged onset date. (R. 251-72).[8] Upon reconsideration, Plaintiff had the same severe impairments. (R. 255, 265). For Plaintiff's physical RFC, Dr. Caberwal opined Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently. (R. 257, 267). Dr. Caberwal formed the same conclusions as Dr. Stein for all of Plaintiff's other exertional, postural, and manipulative limitations. (R. 257-58, 267-68). Accordingly, Dr. Caberwal also concluded "Plaintiff should be able to perform the given RFC." (R. 258, 268).

---

[7] Dr. Alderini found the same limitations as Dr. Harrison for Plaintiff's mental RFC, and a couple of additional limitations. (R. 259, 269). Ultimately, Dr. Alderini also concluded Plaintiff's allegations were only partially consistent with the objective evidence, and because Plaintiff did not allege any new or worsening impairments, she "maintains the capacity to perform SRRTs [with] restrictions." (R. 256, 259-60, 266, 269-70). Again, Plaintiff did not challenge the ALJ's mental health impairment analysis, so this Report does not discuss Dr. Alderini's findings at greater length.

[8] Dr. Caberwal (and Dr. Alderini) also reviewed Plaintiff's medical records for both her SSI claim, (R. 253-62), and her DIB claim, (R. 263-72). The Disability Determination Explanation reports for both claims were also largely identical upon reconsideration.

## 2. Treating Medical Providers' Opinions[9]

### a.    Christin Blanton, D.O.

On February 24, 2024, Christin Blanton, D.O., examined Plaintiff. (R. 1173-80). Plaintiff reported a history of heart palpitations, chest pain, arm and back pain, bipolar depression, herniated disc problems, and shoulder problems—for all of which Dr. Blanton noted reported symptoms and treatment. (R. 1173-74). During the examination, Plaintiff was not in acute distress. (R. 1176). Rather, Plaintiff was alert and had good eye contact, fluent speech, normal memory, and good concentration. (R. 1177). Plaintiff had a steady and symmetric gait (without the presence of an assistive device), good hand-eye coordination, no palpable muscle spasms, and 5/5 muscle strength. Id. For musculoskeletal concerns, Dr. Blanton noted tenderness of Plaintiff's entire back, right shoulder, chest, and neck. (R. 1178). However, Plaintiff maintained her ability to lift, carry, and handle light objects, and had normal fine and gross manipulative abilities. Id. During the exam, Plaintiff had "moderate difficulty walking on her heels and toes." (R. 1179). But although Plaintiff was cooperative, Dr. Blanton noted she "did not give good effort with all activities." Id.

After considering Plaintiff's allegations and the examination findings, Dr. Blanton concluded Plaintiff had "hyperalgesia and diffuse body tenderness everywhere, worse in the back and paraspinal thoracic region and the entire right upper extremity." Id. Dr. Blanton found that Plaintiff had a decreased range of motion at the right shoulder, cervical spine, and right wrist. Id. In terms of limitations, Dr. Blanton opined that Plaintiff had no limitations with sitting, had mild

---

[9] The opinion of psychiatrist Felicia Washington, PMHNP-BC, (R. 1182-85), is not discussed at length in this Report because Plaintiff did not take issue with the ALJ's analysis of her mental impairments. For Plaintiff's ability to perform work-related activities, Dr. Washington did conclude that Plaintiff could: (1) understand, retain, and follow instructions; (2) sustain attention to perform simple repetitive tasks; (3) relate to others, including fellow workers and supervisors; and (4) tolerate stress/pressures associated with day-to-day work activity. (R. 1185).

limitations with standing and walking due to chronic pain in her body, but would not need an assistive device for short and long distances and uneven terrain. Id. Plaintiff had moderate limitations with lifting and severe limitations with carrying weight due to right shoulder and back pain; limitations to frequent reaching grasping, handling, fingering and feeling; and no limitations with bending, stooping, crouching and squatting. Id. While Dr. Blanton opined there were no relevant visual or communicative limitations, Plaintiff had relevant workplace environmental limitations due to "hyperalgesia limiting her ability to sit on certain things and walk on certain textures." (R. 1180).

### b.    Sun D. Kwon, M.D.

In a statement made on October 15, 2024, Sun D. Kwon, M.D., opined that Plaintiff would "probably be unproductive for hours out of any 8-hour day, and days out of any week." (R. 1843). Dr. Kwon treated Plaintiff for CRPS. Id. He noted that Plaintiff suffers from intense pain in her arm—often a burning pain with a "stinging [sensation], an extreme sensitivity to heat or cold, swelling, changes in skin temperature, occasional sweatiness, tenderness, joint stiffness, spasm[s], and reduced, painful mobility"—despite cooperating with maximal treatment. Id.

### c.    Jenny L. Andrus, M.D., and Brian Whittington, P.T.

On August 13, 2023, Jenny L. Andrus, M.D., performed a medical assessment for Plaintiff's workers' compensation claim evaluation, completing a partial check-box questionnaire as part of the assessment. (R. 1853-60). Dr. Andrus noted that she did not think Plaintiff's described symptoms are consistent with those seen in patients with CRPS. (R. 1854). Ultimately, Dr. Andrus concluded Plaintiff "should be able to return to work." (R. 1858). Upon an earlier request from Dr. Andrus, physical therapist Brian Whittington, P.T., performed a job specific functional capacity evaluation on June 2, 2022. (R. 1867-79). Plaintiff's main limiting factor on

the day of evaluation was right upper extremity pain. (R. 1867). However, PT Whittington also concluded Plaintiff could perform tasks with light physical demand. Id.

### d.    Linwood Joyner II, M.D.[10]

On September 9, 2024, Linwood Joyner II, M.D, completed a certificate of medical necessity for the Virginia Department of Medical Assistance Services. (R. 1842). In this checkbox form certificate, Dr. Joyner noted Plaintiff had "impaired mobility," "impaired endurance," and "restricted activity," which required a power wheelchair for her impairments and activities of daily living. Id.

### C.    Testimony Before the ALJ

The ALJ questioned Plaintiff, represented by her attorney, at a telephone hearing on November 7, 2024. (R. 52-69). The ALJ also heard testimony from the VE, Ty Pennington. (R. 69-75).

### 1.    Plaintiff's Testimony[11]

Plaintiff testified that she is 5'3" and weighs around 170 pounds. (R. 58). She is widowed and has six children, most of whom she sees on a regular basis, and one grandchild. (R. 59). For her living situation, she resides with four of her children and supports her household with income from her husband's death benefits. Id. Plaintiff noted that she is in the midst of a workers' compensation claim settlement as well. (R. 59-60).

---

[10] The ALJ's opinion does not evaluate this opinion at length because it constitutes a "[d]ecision by other governmental agencies and nongovernmental entities," and thus she need not consider for Plaintiff's RFC determination. (R. 40) (citing 20 C.F.R. §§ 404.1504, 416.904). However, given this is part of Plaintiff's argument for summary judgment, this Report summarizes Dr. Joyner's approval for durable medical equipment.

[11] Prior to Plaintiff's testimony, her counsel made a brief opening statement. (R. 57-58). Plaintiff's counsel remarked that Plaintiff is significantly restricted by her limited education—as demonstrated by her school records and special education classes—and a well-documented workers' compensation accident that injured several parts of her body and led to the development complex regional pain syndrome. (R. 57).

In terms of her education, Plaintiff testified that she did not think that she completed ninth grade, recalled being in special education classes, and was unable to successfully get her GED despite trying three times. (R. 60, 62). Plaintiff does not consider herself able to read. (R. 61). For example, in response to the ALJ's question, Plaintiff testified that she could not read instructions on a box-brownie mix. Id. When she gets Social Security-related mail, Plaintiff stated that her son reads them for her. Id. In fact, for her driver's license exam, the computer read the questions to Plaintiff, and it still took her seven attempts to pass. Id. Plaintiff testified that she now has a driver's license, with the number of times that she drives varying depending on the week, but that she cannot really read the green road name signs. (R. 60-61). Although Plaintiff testified she could not read or write, she has a license to operate equipment like a forklift and pallet jack. (R. 63). The test for certification for that equipment did not have any written components but rather relied on a demonstrated ability to operate the machinery. Id.

When discussing past work, Plaintiff testified that she did a lot of different work at the Smithfield Fresh Meats factory. (R. 63). For this job, Plaintiff was both on her feet and using her arms, and the heaviest she ever lifted at Smithfield was around 90 pounds. (R. 63-64). Plaintiff reported that she never worked anywhere in 2022 or since then. (R. 64). In terms of money, Plaintiff testified that she has a PayPal account and relies on the balance shown in her account to determine if she has sufficient money for purchases. (R. 62). When asked what would happen if she were to pay in cash, Plaintiff testified that she would mostly rely on whatever the cash register said she owed. Id.

Upon examination by her counsel, Plaintiff testified that she experiences foot pain and suffers from CRPS. (R. 65). As a result, Plaintiff answered that she would not be able to perform a job that required her to stand for four or five hours a day because her legs would swell. (R. 65-

10

66). Even for jobs that allow Plaintiff to sit or stand all day, Plaintiff testified that she does not have motor skills to work with her hands. (R. 66). Additionally, she remarked that a finger on her left hand was amputated, adding to her motor skills difficulty. (R. 66-67). Given these challenges, Plaintiff testified that she is also unable to help around the house as she once used to. (R. 67). For example, Plaintiff noted she cannot sweep or mop the floor, cook, wash dishes, or fold clothes. Id. In order to complete these sorts of activities of daily living, Plaintiff noted she would have to take a lot of breaks. (R. 68).

## 2.    Testimony from the VE

The VE categorized Plaintiff's past relevant work as a material handler or meat packer (DOT 929.687-030), which is heavy, semi-skilled, SVP 3 work. (R. 69). The ALJ's hypothetical[12] presented to the VE posited an individual with an age, education, and work background similar to the Plaintiff's that could perform light work with the following capabilities:

> [She] can occasionally lift or carry 20 [pounds]; frequently lift or carry 10 [pounds]; sit, stand, or walk 6 hours each in an 8-hour workday; occasionally push, pull with the upper extremities and lower extremities; occasionally climb, stoop, kneel, crouch, crawl, and do occasional reach; frequent handle, finger; occasional exposure to hazards; requires instructions in oral format.

(R. 69-70). The VE testified that this hypothetical would eliminate past relevant work. (R. 70). At the ALJ's request to identify any jobs the hypothetical individual could perform, the VE testified that there would be no jobs for this individual, with the occasional reaching being the most limiting factor in the labor market and the occasional pushing and pulling having an impact as well. Id.

---

[12] The VE noted that the Dictionary of Occupational Titles ("DOT") does not actually discuss pushing and pulling limitations, the identification of a single extremity and its dominance, limitations regarding instructions (including whether they are in an oral format, simple, require sustained concentration, or paced in a specified amount of time), limitations regarding interactions with others, or limitations from changes in a work environment. (R. 70, 72). As such, the VE based his testimony for those elements in the hypotheticals on his training and twenty-five years of experience. Id.

11

The ALJ modified the hypothetical such that the individual, working at the light level, had the following capabilities:

> [O]ccasionally lift and carry 20 [pounds], frequently lift and carry 10 [pounds]; frequent but not constant pushing and pulling with the right [dominant] upper extremity; . . . frequently stoop; and frequent reaching with the right upper extremity; and also frequent handling with the right upper extremity; frequent fingering and feeling bilaterally. Adding onto that, the individual can understand, remember, and carry out simple instructions; sustain concentration, persistence, pace in two-hour increments; tolerate occasional interaction with others; and requires a work environment with few to no changes.

(R. 71). The VE confirmed that this would still eliminate past relevant work, but noted the following light, unskilled, SVP 2 jobs would exist: (1) small parts assembler (DOT 706.684-022), which has 20,000 jobs in the national economy; (2) marker or price clerk (DOT 209.587-034), which has 167,000 jobs in the national economy; and (3) routing clerk (DOT 222.687-022), which has 122,000 jobs in the national economy. (R. 71-72).

When Plaintiff's attorney altered the ALJ's hypothetical so that the individual would also be illiterate, the VE testified[13] that it would make it difficult for the individual to perform those jobs. (R. 72-73). Plaintiff's attorney then modified the ALJ's hypothetical such that the individual would be unproductive for hours out of an eight-hour work-day, and the VE confirmed this limitation would mean the individual could not obtain competitive employment. (R. 73).

---

[13] The VE noted that this was a harder hypothetical to answer since it falls outside the framework of the DOT. (R. 72). However, the VE noted the reading levels for some of the jobs—like the small parts assembler job would require a reading rate of 95 to 120 words per minute—before testifying. Id. The ALJ adequately considered any literacy concerns raised from the administrative hearing in her opinion. (R. 43). Specifically, the ALJ first noted that the VE only testified that the small parts assembler job would be difficult to perform if an individual were illiterate. Id. But even eliminating that job, there would still be other jobs in significant numbers in the national economy for Plaintiff. Id. Additionally, although the ALJ acknowledged the VE's testimony, she did not accept that it would be difficult to perform all the jobs the VE identified because Plaintiff had past relevant work she was able to perform within her literacy levels without significant difficulty. Id. Although Plaintiff does not raise the issue of literacy in her brief, the ALJ adequately evaluated literacy in her opinion.

### III.   STANDARD OF REVIEW

The Court's review is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence.   42 U.S.C. § 405(g); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).   Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)).   It consists of "more than a mere scintilla" of evidence, but the evidence may be somewhat less than a preponderance.   Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.   Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456.   "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)."   Craig, 76 F.3d at 589.   The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed.   Perales, 402 U.S. at 390; see also Lewis v. Berryhill, 858 F.3d 858, 868 (4th Cir. 2017).   Ultimately, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law.   Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### IV.   ANALYSIS

In her brief, Plaintiff challenges the Commissioner's final decision and argues that the ALJ failed to properly analyze her CRPS diagnosis, subjective complaints of pains, and need for an

13

assistive device, which she contends led to an RFC determination that falls short of Plaintiff's actual limitations. Pl.'s Br. (ECF No. 13, at 4-10). Thus, she argues the RFC is not supported by substantial evidence. As explained below, I find the ALJ complied with the rules and her explanation and citation to the medical record are sufficient to satisfy the substantial evidence test. Accordingly, I find no error in the ALJ's analysis, and this Report recommends that the court affirm the Commissioner's decision.

**A.    Framework for SSA Disability Evaluation**

A person may file for and receive DIB under the Social Security Act if he or she meets the insured status requirements of 42 U.S.C. § 423(c)(1), is under the retirement age as defined in § 416 of the Act, and is under a disability as defined in § 423(d). Title XVI of the Act provides SSI benefits to "financially needy individuals who are aged, blind, or disabled regardless of their insured status." Bowen v. Galbreath, 485 U.S. 74, 75 (1988) (citing 42 U.S.C. 1382(a)). As relevant here, the Act defines "disability" as the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); accord 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a).

An impairment renders an individual disabled only if it is so severe as to prevent the person from engaging in his or her prior work or any other substantial gainful activity that exists in the national economy. See 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1505(a), 416.905(a). SSA regulations set out a sequential analysis which ALJs use to make their determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Specifically, the regulations direct the ALJ to answer the following five questions:

1.    Is the individual involved in substantial gainful activity?

14

2.    Does the individual suffer from a severe impairment or a combination of impairments that meets the durational requirement and significantly limits his or her physical or mental ability to do basic work activities?

3.    Does the individual suffer from an impairment(s) that meets or equals a listing in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (a "listed impairment") and meets the durational requirement?

4.    Does the individual's impairment or combination of impairments prevent him or her from performing any relevant past work?

5.    Does the individual's impairment or combination of impairments prevent him or her from performing any other work?

An affirmative answer to question one, or a negative answer to questions two, four, or five, means the claimant is not disabled. An affirmative answer to questions three or five establishes disability. The claimant bears the burden of proof during the first four steps. If the analysis reaches step five, the burden shifts to the Commissioner to show that other work suitable to the claimant is available in the national economy. See Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995); Jolly v. Berryhill, No. 16-cv-38, 2017 WL 3262186, at *6 (E.D. Va. July 13, 2017).

The SSA considers all material evidence in evaluating whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)(3), 404.1520b, 416.920(a)(3), 416.920b. This includes "(1) the objective medical facts; (2) the diagnoses and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age." Jolly, 2017 WL 3262186, at *6 (citing Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967)). Ultimate responsibility for making factual findings and weighing the evidence rests with the ALJ. Hays, 907 F.2d 1453, 1456 (4th Cir. 1990) (citing King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979)).

**B.    The ALJ Decision Currently Before the Court for Review**

After applying the five-step sequential evaluation process for disability determinations, the ALJ found that Plaintiff has not been disabled from July 16, 2021, through the date of the decision.

15

(R. 43); see 20 C.F.R. §§ 404.1520(g), 416.920(g). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date of July 16, 2021. (R. 27). At step two, the ALJ found that Plaintiff suffered from the following severe impairments: "lumbar radiculopathy; intervertebral disc disorder; neuropathy; right ankle arthritis; right radius fracture/crush injury; complex regional pain syndrome; bipolar affective disorder; depression; somatic symptom disorder; specified trauma and stressor-related disorder; generalized anxiety disorder; mood disorder; attention-deficit hyperactivity disorder (ADHD); and an unspecified learning disability." (R. 28). The ALJ did not find that these impairments or any combination of them met or equaled a listed impairment in 20 C.F.R. Part 404 at step three. (R. 29-32). At step 4, the ALJ determined that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). (R. 32).

> Specifically, [Plaintiff[ can only occasionally lift and/or carry up to 20 pounds, and frequently lift and/or carry up to ten pounds frequently; she can sit, stand, and walk up to sic hours each in an eight-hour workday; she can frequently push/pull with the right, dominant, upper extremity; [Plaintiff] can frequently stop; she can frequently reach and handle with the right upper extremity; she can frequently finger and feel bilaterally; additionally, [Plaintiff] can understand, remember, and carry out simple instructions; she can sustain concentration, persistence, or pace in two-hour increments; she can tolerate occasional interaction with others; and she requires a work environment with few to no changes.

Id. In making this finding, the ALJ considered all symptoms and objective medical evidence along with prior administrative medical findings and medical opinions. Id. The ALJ then concluded Plaintiff could not perform any relevant past work. (R. 41). Finally, at step five, the ALJ determined that Plaintiff could perform other jobs as corroborated by the vocational expert's testimony that Plaintiff could be a marker/price clerk or routing clerk, for example. (R. 42-43). As such, the ALJ concluded that Plaintiff was not disabled from her July 16, 2021 alleged disability onset date through the date of the decision. (R. 43).

**C.      The ALJ's RFC Determination Is Supported by Substantial Evidence.**

Plaintiff argues the ALJ inadequately explained why she rejected significant limitations allegedly caused by Plaintiff's impairments, thus resulting in an RFC that is not supported by substantial evidence. Pl.'s Br. (ECF No. 13, at 4-6). Specifically, Plaintiff takes issue with the ALJ's failure to properly consider Plaintiff's use of an assistive device and need for a power wheelchair. Id. at 5. Additionally, Plaintiff argues that the ALJ did not comply with Social Security Rule ("SSR") 03-02p by allegedly failing to evaluate Plaintiff's impairments that are supported by evidence in the record, including Plaintiff's CRPS diagnosis and her related subjective complaints. Id. at 7-9. The Commissioner argues that the ALJ followed the proper regulatory framework and carefully considered the longitudinal evidence in the record as required before concluding that Plaintiff did not need an assistive device and that there was insufficient evidence in the record to establish a claim of disability. Def.'s Opp'n (ECF No. 14, at 12-20). After considering the ALJ's opinion and the record as a whole, I find that the ALJ's consideration of the record and opinion evidence conformed with the regulations. Thus, the ALJ's RFC finding is supported by substantial evidence.

**1. The ALJ Appropriately Evaluated Medical Evidence to Determine Plaintiff Did Not Need An Assistive Device.**

Although the need for an assistive device can impact a plaintiff's RFC, an ALJ "is not required to account for an assistive device if Plaintiff has not demonstrated that the device is medically required." Hayes v. Kijakazi, No. 220-cv-03033, 2022 WL 1057179, at *5 (D.S.C. Jan. 27, 2022), R. & R. adopted sub nom. Debra Ann H. v. Kijakazi, No. CV 2:20-3033, 2022 WL 796817 (D.S.C. Mar. 15, 2022). To establish medical necessity of an assistive device, "there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time,

17

periodically, or only in certain situations; distance and terrain; and any other relevant information)." SSR 96-9P, 1996 WL 374185, at *7 (S.S.A. July 2, 1996). An "unambiguous opinion from a physician stating the circumstances in which an assistive device is medically necessary" may be sufficient in establishing the need for a medical device. Hayes, 2022 WL 1057179, at *6.

Plaintiff contends that the ALJ avoided consideration of Dr. Joyner's medical opinion regarding the use of a power wheelchair under the guise that the decision requiring wheelchair use was made by the Virginia Department of Medical Assistance Services—another governmental agency—and as such, was unpersuasive. Pl.'s Br. (ECF No. 13, at 5-6). However, the ALJ correctly noted that decisions by other governmental agencies and nongovernmental entities are not binding for the ALJ. 20 C.F.R. §§ 404.1504, 416.904. This is "[b]ecause a decision by any other governmental agency of a nongovernmental entity" regarding disability is based on its rules. Id. However, even considering Dr. Joyner's approval of a power wheelchair, there is insufficient information in her certification of approval to support the finding of an impairment that requires an assistive device. Plaintiff argues Dr. Joyner's certificate of approval should be evaluated as a medical opinion, but even doing so, it is not extensive. Specifically, Dr. Joyner's checkbox form— unaccompanied by any notes of treatment or examination records—is insufficient to establish whether Plaintiff has an impairment-related limitation that requires the use of a power wheelchair. There is no medical documentation regarding the duration or parameters of use for an assistive device. See (R. 1842). In fact, there is no mention of any assistive device—much less a power wheelchair—in Plaintiff's application or during her administrative hearing. See (R. 57-69). Instead, the medical record notes that Plaintiff ambulated with a steady and symmetric gait, without an assistive device. (R. 36) (citing R. 1177). Medical providers, like Dr. Kwon and Dr.

18

Blanton, noted Plaintiff had a steady gait, without mentioning a wheelchair or any other assistive device or specifically noting Plaintiff did not need one. (R. 1847-48, 1177). While Plaintiff cites to portions of the administrative record that may suggest gait issues at times, the ALJ need not discuss every treatment note in the record because that would be an impossible obligation. Thomas v. Berryhill, 916 F.3d 307, 312 (4th Cir. 2019) (citing Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014)); Best v. Berryhill, No. 15-2990, 2017 WL 835350, at *3 (D.S.C. Mar. 3, 2017) (stating that the ALJ "need not cite every piece of possibly relevant evidence in the record"). Here, the ALJ permissibly considered the record as whole when rendering his decision and determining Plaintiff's RFC. Felton-Miller v. Astrue, 459 F. App'x 226, 231 (4th Cir. 2011). Thus, the ALJ's determination that Plaintiff does not require an assistive device is supported by the medical evidence.

### 2. The ALJ's Analysis of Plaintiff's CRPS Diagnosis and Subjective Allegations Is Supported by Substantial Evidence.

To evaluate CRPS, also called reflex sympathetic dystrophy syndrome ("RSDS"), an ALJ uses a "sequential evaluation process, just as for any other impairment." SSR 03-2p, 2003 WL 22399117, at *6 (S.S.A. Oct. 20, 2003). Once CRPS is established as a medically determinable impairment, the ALJ "must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities," especially given that a variety of symptoms can be associated with CRPS. Id. If a plaintiff's reports of "pain or other symptoms are not substantiated by objective medical evidence, the [ALJ] must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." Id. "This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about

19

the symptoms and how they affect the individual, and any other relevant evidence in the case record." Id.; see also Stubbs v. Kijakazi, No. 6:20-cv-3606, 2021 WL 7286831 (D.S.C. Sept. 2, 2021), R. & R. adopted, 2022 WL 557479 (D.S.C. Feb. 24, 2022).

In this case, the ALJ properly followed SSR 03-2p's guidance to evaluate Plaintiff's claim through a sequential evaluation process after considering the record as a whole. (R. 27-43). Specifically, after identifying CRPS as one of Plaintiff's medically determinable severe impairments, the ALJ accounted for the credibly established limitations resulting from CRPS-related pain and other symptoms by restricting her to a narrow range of light work with additional postural, manipulative, environmental, and mental limitations. (R. 27, 32-41). The ALJ also explained why the overall record—including the longitudinal medical treatment history, her examination findings, functional capacity evaluations, the opinion of consultative examiners, and the prior administrative medical findings of state agency medical consultants[14]—did not support greater restrictions than the limitations in Plaintiff's RFC finding. (R. 32-41).

Plaintiff argues the ALJ did not comply with SSR 03-02p by failing to evaluate all of Plaintiff's impairments that are supported by evidence in the record, including a diagnosis of CRPS and the subjective complaints of pain related to CRPS, before making an RFC determination. Pl.'s Br. (ECF No. 13, at 7-9). Specifically, Plaintiff argues that if the ALJ had clarified the differing medical opinions and instances of "normal" and "mild" examination findings—as the SSR calls for—before rejecting the opinions, then the differences may have been "explained by the fact that the doctors who saw [Plaintiff] at any singular time, saw her when [Plaintiff's] manifestations happened to be on the wane." Pl.'s Br. (ECF No. 13, at 8). Similarly, for Plaintiff's subjective

---

[14] The ALJ explained why she found portions of medical providers or state agency medical consultants opinions persuasive or unpersuasive. (R. 38-41). Often, when finding a limitation unpersuasive, the ALJ explained it was either because the findings were vague and not expressed in policy-compliant terminology or because they were inconsistent and unsupported by the medical evidence in the record. Id.

20

reports of pain, Plaintiff argues that the ALJ did not explain how normal findings of pain discredit Plaintiff's reports since there is an expectation for the medical record to have conflicting evidence. Id. at 10; see SSR 03-2p, 2003 WL 22399117 at *5 ("[C]onflicting evidence in the medical record is not unusual in cases of RSDS due to the transitory nature of its objective findings and the complicated diagnostic process involved.").

Here, a CRPS diagnosis and Plaintiff's subjective complaints alone are insufficient to establish a claim of disability. For Plaintiff's CRPS diagnosis, the ALJ followed the proper sequential evaluation process outlined in SSR 03-02p, as previously discussed, by considering the record as a whole. In fact, the ALJ specifically referenced Plaintiff's CRPS diagnosis, but noted that "out of the 1430 pages of medical evidence, only two of the 34 exhibits cite such a diagnosis." (R. 35) (citing 1322-23, 1822-25). For the first diagnosis, there were two upper extremity conditions that could have triggered the condition. First, in 2014, Plaintiff slammed her left fifth finger in a door, which resulted in joint swelling. (R. 1640-41). Then in 2015, Plaintiff's left index finger was amputated after getting stuck in a bedroom door. (R. 1613). However, as the ALJ noted, these two injuries occurred in 2014 and 2015, and Plaintiff's CRPS diagnosis was not applied until 2023. (R. 35) (citing R. 1322-23). For Plaintiff's second diagnosis, there was evidence of lower extremity injuries that could have triggered the condition. First, Plaintiff visited the emergency department in September 2022 for moderate swelling her left ankle and tender to palpation through her foot, ankle, and lower leg. (R. 1354). Two years later, Plaintiff complained of long-term bilateral foot pain that she related to an on-the-job injury from 2021, which led to the CRPS diagnosis. (R. 1822-25). However, the ALJ noted that Plaintiff underwent physical therapy following this diagnosis, and she had no obvious deformities or degenerative changes. (R. 35) (citing R. 1188-1257, 1749-1812). The ALJ also cited to Dr. Blanton's physical examination of

21

Plaintiff in February 2024, where Plaintiff did not demonstrate signs of acute distress, and instead she demonstrated a steady and symmetric gait, no palpable muscle spasm, and normal and equal muscle strength. (R. 36) (citing 1172-80). Even though Plaintiff had decreased sensation to light touch at her right arm and leg, and a decreased range of motion in her right shoulder and cervical spine, Dr. Blanton also concluded Plaintiff could lift, carry, and handle light objects, and that her fine and gross manipulation abilities were normal. Id. (citing 1172-80).

In her review of the record, the ALJ also properly recognized Plaintiff's own subjective complaints and their alleged impact on her ability to function. (R. 32-33). However, the ALJ found that Plaintiff's statements were "not entirely consistent with the medical evidence and other evidence in the record." (R. 33). For example, the ALJ considered Plaintiff's medical records from 2020 onwards, which corroborated that Plaintiff had an intact range or motion with mostly normal muscle strength and tone in her extremities and a normal gait despite reports of pain. (R. 33-36) (citing R. 925-39, R. 1065-93). As a specific example, the ALJ considered Plaintiff's complaints of neck and low back pain but also noted that an examination of her neck showed a full, active and passive range of motion with normal palpation and normal muscle strength and tone, and that the December 2020 MRI of her lumbar spine showed no more than minimal degenerative changes. (R. 33) (citing 529-30, 875-77). Additionally, the ALJ considered x-rays and MRIs of Plaintiff's right hand, wrist, elbow, forearm, and shoulder that, despite having mild swelling, tenderness to palpation, or other weaknesses and pain, were mostly normal with an intact range of motion. (R. 34-35). Again, the ALJ also considered medical opinions and prior administrative medical findings, both of which supported her analysis of Plaintiff's subjective complaints. (R. 38-41).

22

Ultimately, Plaintiff's challenge to the ALJ's analysis is a disagreement with the conclusions based on the evidence. However, the ALJ, as the trier of fact, is responsible for resolving conflicting medical evidence. Drumgold v. Comm'r of Soc. Sec., 144 F.4th 596, 605 (4th Cir. 2025) (citing Richardson v. Perales, 402 U.S. 389, 399 (1971); Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012)). When the ALJ does so properly, the court will not "Monday-morning-quarterback the decision unless it is exceptionally clear that the ALJ made a mistake." Id. (citing Arakas v. Comm'r of Soc. Sec. Admin., 983 F.3d 83, 95 (4th Cir. 2020)). Here, the ALJ permissibly considered the record as whole when rendering his decision and determining Plaintiff's RFC. Felton-Miller v. Astrue, 459 F. App'x 226, 230-31 (4th Cir. 2011). I conclude, therefore, that the ALJ's RFC determination is supported by substantial evidence. See Drumgold, 144 F.4th at 604-05.

## V.    RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the court DENY Plaintiff Motion for Summary Judgment, (ECF No. 12), and AFFIRM the decision of the Commissioner.

## VI.    REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.    Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with

23

a copy thereof.  See Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.    A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Newport News, Virginia
June 17, 2026

24